IN THE UNITED STATES DISTRICT COURT
IN AND FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| | § | |
| **UNITED STATES OF AMERICA** | § | |
| | § | |
| | § | |
| - vs - | § | CRIMINAL No.  06-102-02 (JDB) |
| | § | |
| | § | |
| **ANDERSON STRAKER,** | § | |
| **WAYNE PIERRE,** *el al.* | § | |
| | § | |
| Defendants. | § | |
| | § | |

**GOVERNMENT'S OPPOSITION TO DEFENDANT STRAKER'S
AND DEFENDANT PIERRE'S MOTIONS TO CONDUCT
DEPOSITIONS OF UNAVAILABLE WITNESSES**

The United States of America ("United States" or "Government") opposes defendant

Anderson Straker's Motion to Conduct Depositions of Unavailable Witnesses ("Straker Motion")

and defendant Wayne Pierre's Motion to Conduct Depositions of Unavailable Witnesses ("Pierre

Motion"), because, as set forth below, neither Motion establishes a requisite basis for the Motion.

### *Nature of the Case*

Defendant Anderson Straker ("Mr.  Straker" or "defendant") is one of twelve Trinidadian

nationals who have been indicted in the District of Columbia for Conspiracy to Commit Hostage

Taking Resulting in Death and with Hostage Taking Resulting in Death, both charges being in

violation of 18 U.S.C. § 1203(a).  According to the allegations of the superseding Indictment,

beginning on or about February 1, 2005 and ending on or about April 15, 2005, Mr. Straker and

his co-conspirators, embarked upon a common plan to obtain the money of American citizen,

Balram Maharaj, who was a visitor to the Island of Trinidad and who had relatives there.  The

conspirators' initial plan was to kidnap Mr. Maharaj's 5-year old son, Dinesh Maharaj, and to

hold Dinesh for ransom.  However, the conspirators later discarded the initial plan and

determined to kidnap Balram Maharaj and sought to obtain a ransom of Mr. Maharaj's money,

from Mr. Maharaj's relatives, for his release.  On April 6, 2005, in accordance with their plan,

Balram Maharaj was abducted. and a ransom of $3,000,000 Trinidad (approximately $500,000

US) was demanded for his release.  Mr. Maharaj was held captive at a hideout in a mountainous

jungle region of Trinidad.  On or about April 13, 2005, Mr. Maharaj expired at the remote

hideout, as he languished in the hands of the conspirators.  Following Mr. Maharaj's death,

members of the conspiracy dismembered his body and buried his body parts at another remote

location in the mountainous jungle.

By April 15, 2005, the ransom demands had ceased.

In January of 2006, Mr. Maharaj's dismembered and decomposed body was located in a

mountainous jungle region in Trinidad.

### The Allegations of Defendant Straker's Motion

In his Motion, Mr. Straker claims he has "located witnesses who have material and

relevant testimony to express for both the Motion to Suppress Statements hearing and for trial

who are located in Trinidad/Tobago, Canada, and Florida." [Straker Motion, page 1]  In his

Motion, Mr. Straker acknowledges intentionally withholding from the Government the identities

of the witnesses sought to be deposed. [*See* Straker Motion, page 1, note 1 ("Defendant is not

seeking to identify his witnesses to the United States prior to the taking of the depositions.")  In

his Motion, Mr. Straker identifies three subject matters as to which he requires the deposition

testimony.  *First*, Mr. Straker claims to have "identified at least three witnesses who can attest to

the oppressive conditions of [Mr. Straker's] confinement and who will testify that [Mr. Straker]

complained to them about being assaulted by an F.B.I. agent in Trinidad.[1]  One of the witnesses

will testify that he complained about the treatment of Mr. Straker to a court of the Republic of

Trinidad/Tobago."  [Straker Motion, page 2]  *Second*, Mr. Straker says he has "identified three

witnesses who are prepared to testify that he regularly visited Canada to see family members and

that he would routinely purchase Air Canada tickets to travel from Trinidad to Canada."  [Straker

Motion, page 3]  Mr. Straker's Motion indicates this testimony is necessary to rebut a possible

Government argument that Mr. Straker's travel to Canada shortly after the murder and

dismemberment of the victim in this case was evidence of Mr. Straker' s consciousness of guilt.

[Id.]  *Third*, in order to challenge the Trinidadian Medical Examiner's opinion testimony in the

Suchit trial, Mr. Straker's Motion says he "has witnesses who can provide specific information

about Mr. Maharaj that will demonstrate a lack of foundation for the medical examiner's

opinions about a diabetic coma."  [Straker Motion, page 3]

    With regard to the availability/unavailability of these potential witnesses, Mr. Straker's

Motion concludes baldly, and without elaboration, that the "witnesses are located in Trinidad,

Canada, and Florida.  They are beyond the subpoena power of this Court and therefore

unavailable to be compelled to appear for live testimony at the Motion to Suppress Statements

---

[1] In Mr. Straker's Motion to Suppress Statements [ECF Document #188], the only reference he makes to an alleged assault by the FBI is his (false) claim that at the La Horquetta police station, while the FBI sought to interview Mr. Straker, "Straker told [FBI Agent] Clauss that he did not trust the F.B.I. and was then slapped in the mouth by Agent Clauss." [Straker Motion To Suppress Statements, page 4]  Even if this was true, which it is not, this single alleged slap supposedly occurred in January of 2006 in Trinidad.  Mr. Straker's Miranda waiver and subsequent confession took place over 18 months later, on July 29, 2007, in Puerto Rico and Washington, D.C.  Hence, any arguable taint (and there was none) had long-since dissipated, in any event.  Moreover, as the Government will not seek to introduce in its case in chief Mr. Straker's January 9,2006 interview it seems axiomatic that witnesses to Mr. Straker's alleged prior-consistent statement as to his alleged treatment by the FBI at that interview are not material.

hearing or trial." [Straker Motion, page 3]

### The Allegations of Defendant Pierre's Motion

In his Motion, Mr. Pierre claims to have "located witnesses who have material and relevant testimony to provide at trial who are located in Trinidad.... Undersigned counsel has identified six witnesses so far that he wishes to depose. Four of the witnesses have expressed an unwillingness or lack of desire to travel to the United States to testify at trial while two of the witnesses would do so." [Pierre Motion, page 1] In addition, Mr. Pierre says "it is possible there will be an additional two to three law enforcement witnesses to be deposed depending on the responses to Letters Rogatory and the Court's ruling on the admissibility of 404(b) evidence." [Id.] While not identifying any of the purported witnesses, Mr. Pierre claims merely that he needs the testimony of these witnesses to rebut the Government's "other crimes that defendant Pierre participated in four other kidnappings during the period December 16, 2004 through July 2005 .... [the witnesses] will provide evidence to the contrary." [Pierre Motion, page 2] Finally, Mr. Pierre joins that portion of Mr. Straker's Motion that seeks the testimony of anonymous witnesses "that will demonstrate a lack of foundation for the medical examiner's opinions [at the Suchit trial] about a diabetic coma." [Pierre Motion, pages 2-3]

With regard to availability/unavailability, Mr. Pierre's Motion says only: "The witnesses are located in Trinidad. They are beyond the subpoena power of this Court and therefore unavailable to be compelled to appear for live testimony [at] trial. Counsel is also concerned that witnesses who have stated that they would reluctantly travel to the United States might change their minds." [Pierre Motion, page 3]

For the reasons set forth below, both Mr. Straker's Motion and Mr. Pierre's Motion are without merit as they fail to make the minimum requisite showing to support the relief they seek.

## DEFENDANTS' MOTIONS ARE WITHOUT PROPER FOUNDATION OR MERIT AND SHOULD BE DENIED

The is "no general constitutional right to discovery in a criminal case." *Weatherford v. Bursey*, 429 U.S. 545, 559 (1977). Nevertheless, the Constitution mandates that a defendant be accorded the opportunity to present a defense. *See, e.g., Chambers v. Mississippi*, 410 U.S. 284, 302 (1973); *United States v. Libby*, 453 F.Supp.2d 35, 42 (D.D.C. 2006) (Walton, J.). In this regard, the Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to have compulsory process for obtaining witnesses in his favor." U.S. Const. amend. VI. It is well-settled that this right is not without limits. The defendant's right to compulsory process extends only where it is within the Government's power to provide it. *See United States v. Moussaoui*, 382 F.3d 453, 463 (4th Cir. 2004), cert. denied, 544 U.S. 931 (2005); *United States v. Greco*, 289 F.2d 247, 251 (2d Cir. 1962). The principle is "well established and undisputed ... that the process power of the district court does not extend to foreign nationals abroad." *Moussaoui*, 382 F.3d at 463-64; *and see United States v. Filippi*, 918 F.2d 244, 246 n.2 (1st Cir. 1990); *United States v. Zabaneh*, 837 F.2d 1249, 1259-60 (5th Cir. 1988).

The Sixth Amendment does not:

> [C]onfer upon the defendant an absolute right to compel the presence of any witnesses the defendant may choose. Rather, a criminal defendant has a constitutional right to compel the presence of witnesses "in his favor." Thus, to compel the presence of a witness under the Sixth Amendment, a defendant must show that the witness will have information that is material and favorable to his defense, and not merely cumulative of the testimony of other available witnesses.

*United States v. Bin Laden*, 2005 WL 287404, *10 (S.D.N.Y. 2005) (internal citations quotations

omitted.)  In order to be "material," there must be a "reasonable probability" that its disclosure to the defense would change the result of the proceeding." *United States v. Bagley*, 473 U.S. 667, 682 (1985).  Thus, "materiality" is not established merely by showing the witness was a participant or witness to the crime charged.  *See United States v. Saa*, 859 F.2d 1067, 1073 (2d Cir. 1988).[2]  Speculation and conjecture will not suffice, *United States v. Ginsburg*, 758 F.2d 823, 831 (2d Cir. 1985), nor will the "mere possibility" that the information might have helped the defense.  *United States v. Agurs*, 427 U.S. 97, 109-110 (1976).

### Compulsory Process For Foreign Witnesses

Although federal courts have the power to subpoena United States residents and nationals found abroad to appear before them, *see* 28 U.S.C. § 1783; *Blackmer v. United States*, 284 U.S. 421, 436-38 (1932), they do not ordinarily have authority to subpoena foreign nationals located in foreign countries.  *See United States v. Yates*, 345 F.3d 1280, 1283 (11th Cir. 2003); *United States v. Olafson*, 213 F.3d 435, 441 (9th Cir. 2000); *cf., United States v. Liner*, 435 F.3d 920, 924 (8th Cir. 2006).  However, if a court is unable to secure the presence of an overseas witness, it may authorize depositions to be taken abroad that may, under limited circumstances, be admitted into evidence in a criminal trial.[3]  *See* Fed. R. Crim. Pro. 15.  In this regard, Rule 15(a)(1) provides, *inter alia*:

---

[2]  Among other things, a defendant's Sixth Amendment compulsory right, and his right to present a defense, generally yield to a prospective witness' Fifth Amendment privilege against self incrimination.  *See, e.g., Carter v. United States*, 684 A.2d 331, 335 (D.C. 1996) (*en banc*).

[3]  Compliance with Rule 15 is a necessary, but not a sufficient, condition for use of a deposition at trial.  *See United States v. McKeeve*, 131 F.3d 1, 8 (1st Cir. 1997).  Rather, admissibility at trial requires compliance with Rule 15, the Rules of Evidence, and the Constitution's confrontation clause.  Id.

> A party may move that a prospective witness be deposed in order to preserve testimony for trial. The court may grant the motion because of exceptional circumstances and in the interest of justice. If the court orders the deposition to be taken, it may also require the deponent to produce at the deposition any designated material that is not privileged, including any book, paper, document, record, recording, or data.

Id.; *see e.g., United States v. Medjuck*, 156 F.3d 916 (9th Cir. 1998); *United States v. McKeeve*, 131 F.3d 1, 8 (1st Cir. 1997); *United States v. Gifford*, 892 F.2d 263 (3d Cir. 1989); *United States v. Salim*, 855 F.2d 944 (2d Cir. 1988); *United States v. Nippon Paper Indus. Co.*, 17 F.Supp. 2d 38, 41-43 (D. Mass 1998).

In *United States v. Kelley*, 36 F.3d 1118, 1124 (D.C. Cir. 1994), the District of Columbia Circuit noted that the party seeking to conduct the deposition bore the burden of demonstrating such "'exceptional circumstances' necessitate the preservation of testimony through a deposition." *Id.* at 1124 (citation omitted). Moreover, the *Kelley* court provided guidance for measuring the existence or absence of the requistite "exceptional circumstances": "Critical factors toward meeting this burden include (1) the materiality of the testimony; and (2) the unavailability of the witness to testify at trial. Moreover, there is typically some showing, beyond 'unsubstantiated speculation,' that the evidence exculpates the defendant." *Id.* at 1125; *accord United States v. Eyong*, 2007 WL 156309, at *1 (D.D.C. 2007) (Bates, J.); *and see United States v. Lanier*, 435 F.3d 920, 924 (8th Cir. 2006) (to establish the requisite "exceptional circumstances," the party must "show the witness's unavailability and the materiality of the witness's testimony"). In addition, some Courts require proof that the "testimony is necessary to prevent a failure of justice," or other considerations. *See United States v. Cohen*, 260 F.3d 68, 78 (2d Cir. 2001); *see also United States v. Ruiz-Castro*, 92 F.3d 1519, 1533 (10th Cir. 1966) (identifying the three factors as among those to be considered); *United States v. Thomas*, 62 F.3d

1332, 1342 (11ᵗʰ Cir. 1995) (listing consideration of unavailability, materiality, and "countervailing factors [that] would make the deposition unjust to the nonmoving party"); *United States v. Aggarwal*, 17 F.3d 737, 742 (5ᵗʰ Cir. 1994) (denial of the motion may be based entirely upon the fact it is untimely).

Further, the Kelley court cautioned that the "purpose of Rule 15(a) is to preserve testimony for trial, not 'to provide a method of pretrial discovery.'"[4] *Kelley*, 36 F.3d at 1124 (*quoting United States v. Troutman,* 814 F.2d 1428, 1453 (10th Cir. 1987).

In *United States v. Eyong*, 2007 WL 156309, at *2-4 (D.D.C. 2007), the defendant sought to take the foreign depositions of three witnesses and provided in support of his motion (1) the names of the three individuals, (2) the precise and detailed testimony each witness was expected to provide; (3) a clear explanation as to what issue(s) the indicated testimony was material; and (4) a detailed and cogent explanation as to why each witnesses refused to come to the United States to testify at trial:

### a.  Thompson Ndip

Thompson Ndip is a resident of Limbe, Cameroon and is an employee of the Cameroonian government.  He is the elder brother of the now deceased Stephen Ndip.  Stephen Ndip, a Cameroonian citizen, resided with Mr. Eyong in the United States in 2003.  The defense will demonstrate at trial that Stephen Ndip altered the letters that were being sent out to invitees to the Congressional Black Caucus Conference on Africa, and using the altered templates, invited several of

---

[4]  The Government notes that, at the July 1, 2008 status conference in this matter, counsel for Mr. Straker announced cryptically – and for the first time – that the defendants now wished to take the depositions of **twenty or more** persons, none of whose identities have been provided to the Government.  The sheer number suggests defendants are seeking to torture Rule 15 into a vehicle for them to improperly obtain impermissible discovery, as did the reference in Mr. Pierre's Motion (page 1) that he may wish to take the depositions of "two or three law enforcement witnesses," with no effort whatever to identify "exceptional circumstances" with regard to any of them.

his friends from Cameroon to attend the Conference under the Congressman's signature. These altered letters are the letters referenced throughout the indictment and allegedly used to support the visa applications referred to in Counts Two, Three, Five and Six. Mr. Thompson Ndip will testify that his brother, Stephen, was a political activist in Cameroon who supported the separation of the English speaking portion of Cameroon from the French speaking side of Cameroon. As such, he was at odds with the very government that Mr. Thompson Ndip works for in Cameroon. Thompson is fearful of reprisal should his involvement in this case become known to his government. However, he has agreed to be deposed in a neighboring country such as Nigeria or Gabon, or in Cameroon if arrangements can be made that do not involve the presence of other individuals from Cameroon who he fears might report his involvement to the government of Cameroon. He does not want to travel to the United States for trial because he fears he would have to explain to his government why he was coming to the United States. He fears reprisal in his country upon his return. Thompson Ndip has information material to the defense. He will testify that he received a phone call from Mr. Eyong. Mr. Eyong was upset because Stephen Ndip had changed the information contained in letters that were sent to the United States Embassy in Cameroon and Germany to invite individuals to a conference in the United States. Mr. Eyong advised Mr. Ndip that Mr. Eyong's supervisors at work were upset and that he was disappointed that Stephen had betrayed his trust.

Mr. Ndip will testify that after he received this call from Mr. Eyong, he called his brother Stephen immediately and left a message for him. When Stephen returned his call, he admitted to Thompson that what Mr. Eyong had told him was true. Stephen told Thompson that while he was in the Congressman's Office assisting Mr. Eyong in the processing of the invitations, he modified the letter and used it to invite several of his friends who were Cameroonian activists to the United States. Thompson Ndip was angry and ashamed of what his brother had done. He advised his brother to apologize to Mr. Eyong, and Thompson also called Mr. Eyong to express an apology on behalf of his family. Stephen Ndip later died in the United States as the result of a car accident.

### b. Valery Donfack

Valery Donfack is a citizen of Cameroon who resides in Germany. He is referred to by name in the indictment in Counts Three and Six. He is unwilling to travel to the United States to testify, in part because he is afraid that the United States government might take legal action against him. He is, however, willing to be deposed. His testimony is directly material to Counts Three, Six and Eight. He would testify that he was a friend of Stephen Ndip. Stephen Ndip invited him to attend the Congressional Black Caucus meeting. He never spoke with or met Mr. Eyong until he arrived in the United States. He would also testify that he

never made any efforts to stay in the United States when he arrived, and had no intent to do so, but in fact returned to Germany when his visit concluded.

### c. Oben Eyong

Oben Eyong is a citizen of Cameroon who resides in Germany. He is referred to by name in the indictment in Counts One and Four. He is the brother of Njock Eyong. He is unwilling to travel to the United States to testify, in part because he is afraid that the United States might take legal action against him. He is, however, willing to be deposed. His testimony is directly material to Counts One, Four, and Seven. He would testify that his brother told him he would try to get him a visa to attend his graduation ceremony. He would also testify that although Mr. Eyong wanted Oben to attend the graduation ceremony, he never had any intention to seek asylum in the United States or to remain beyond the time requested in the visa application. He left his brother a message saying that the visa application was denied, and that was the last Oben heard of it until after the graduation was over.

Defendant 's Motion To Take Foreign Depositions, Crim No. 06-305 (JDB), *United States v.*

*Njock Eyong*, [ECF Document # 17].

In *Eyong*, the Court noted that the Government did not dispute that any of the three

witnesses was unavailable; nor did the Government contest that the defendant had met his other

two prongs, at least as to two of the witnesses. *Id.* at *1. As to the remaining witness, the

Government's quarrel focused on the admissibility of the testimony, rather than on the propriety

of its preservation. *See id.* at *2. Hence, in *Eyong*, the Court ordered the depositions could

proceed.

Here, unlike in *Eyong*, defendants seek to proceed in a "Star Chamber-like" manner.

Neither Motion identifies the proposed witnesses (indeed both Motions intentionally decline to

so do); neither Motion sets forth with particularity the substance of the witness' testimony;

neither Motion demonstrates in detail how the testimony is material; and neither Motion provides

more than a conclusory statement that the witnesses will not come to the United States to testify.[5]

Moreover, neither Motion has addressed, much less satisfied, the third prong:  a non-speculative

basis to determine "that the evidence [sought] exculpates the defendant."[6]

Because neither Mr. Straker nor Mr. Pierre has established  (1) the materiality of the

testimony, (2) the unavailability of the witness to testify at trial, and (3) beyond 'unsubstantiated

speculation,' that the evidence exculpates the defendant," both have failed to establish that

"exceptional circumstances" exist sufficient to warrant the taking of Rule 15 depositions in this

case.

Because neither Mr. Straker's Motion nor Mr. Pierre's Motion have met their burden of

establishing the existence of "exceptional circumstances" sufficient to warrant the taking of Rule

15 depositions, their Motions are without merit and should be denied.

---

[5]  Indeed, in his Motion, Mr. Pierre says that two of the six witnesses he wishes to depose **have agreed** to come to the United States to testify.   [Pierre Motion, page 1]   As to the other four witnesses, Mr. Pierre says in tepid, ambiguous, conclusory fashion only that the four witnesses "have expressed an **unwillingness _or lack of desire_** to travel to the United States to testify at trial" [Pierre Motion, page 1 (emphasis provided)], which is a vacuous vessel, indeed, from which to sustain defendant's burden of establishing that the witnesses are *in fact* "unavailable" for Rule 15 purposes.

[6]  Moreover, it is vanishingly improbable, for instance, Mr. Straker's desire to take depositions of three persons in Canada to say that he often travels to Canada can "exculpate" Mr. Straker from his role in the hostage-taking and death of the victim in this case.  Similarly, it seems beyond cavil to propose that deposing fact witnesses who allegedly have knowledge of the severity of the victim's diabetic condition can be materially "exculpatory" of these defendants. This is so, because if their intention is to prove that Balram Maharaj suffered from less-severe afflictions than appeared at the Suchit trial, then they will simply have killed a less-sick man. If their goal is to establish that Balram Maharaj was more severely afflicted than appeared at the Suchit trial, then they will have killed a more-sick man.  In either event, Balram Maharaj was alive when they kidnapped him and held him for ransom and he expired while they continued to hold him hostage for ransom.

WHEREFORE, for each of the independent reasons set forth above, Defendant Anderson Straker's Motion to Conduct Depositions of Unavailable Witnesses and Defendant Wayne Pierre's Motion to Conduct Depositions of Unavailable Witnesses should be, in all things, denied.

    Respectfully submitted,

JEFFREY A. TAYLOR (D.C. Bar No. 498610)
United States Attorney


    /S/

By: _____

BRUCE R. HEGYI (D.C. Bar No. 422741)
Assistant United States Attorney
Federal Major Crimes Section
555 Fourth Street, N.W., Room 4848
Washington, D.C.  20530
(202) 305-9637
(202) 353-9414 (fax)
www.bruce.hegyi@usdoj.gov


JEANNE M. HAUCH
Assistant United States Attorney
National Security Section
555 Fourth Street, N.W., 11th Floor
Washington, D.C.  20530
(202) 514-5776